# WIGGINS *v.* STATE OF MARYLAND ET AL.

[No. 185, September Term, 1974.]

*Decided September 5, 1975.*

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE, and O'DONNELL, JJ.

*Peter S. Smith,* with whom was *Michael S. Elder* on the brief, for appellant.

*James I. Keane, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellees.

SMITH, J., delivered the opinion of the Court. LEVINE and ELDRIDGE, JJ., dissent and ELDRIDGE, J., filed a dissenting opinion in which LEVINE, J., concurs at page 717 *infra.*

In this case appellant, Alphonso C. Wiggins (Wiggins), asks us to overrule our approval in *Franklin v. State,* 264 Md. 62, 68, 285 A. 2d 616 (1972), of "May 15, 1969, the date of finality set out in . . . *Long* [*v. Robinson,* 316 F. Supp. 22 (D. Md. 1970), *aff'd,* 436 F. 2d 1116 (4th Cir. 1971),] and adopted by *Greene* [*v. State,* 11 Md. App. 106, 273 A. 2d 830 (1971)]" as "an appropriate, proper and valid selection" of an effective date for the applicability of that holding. It is pointed out in this regard that *Woodall v. Pettibone,* 465 F. 2d 49 (4th Cir. 1972), *cert. denied,* 413 U. S. 922 (1973), held that *Long* should be retroactively applied. However, the

holding of that court in this matter is not binding upon us. We shall decline most respectfully to accede to the point of view there expressed since we believe it to be in error.

In *Long* the court held "[t]he Maryland Juvenile Causes Act, Md. Ann. Code [(1957, 1966 Repl. Vol.)], Art. 26, Secs. 51 *et seq.*, . . . unconstitutional insofar as it exempts Baltimore City from the uniform juvenile age requirement of eighteen (18) years," as well as "[t]he provisions of Art. 4, S240 of the Public Local Laws of Baltimore City, as applied since 1945, . . . insofar as they define a child as a 'person under the age of sixteen years' thereby excluding sixteen and seventeen year olds in Baltimore City from the scope of the Juvenile Causes Act."

It is stipulated: Wiggins was born on June 23, 1944. He was indicted in 1960 on a charge of burglary allegedly committed on August 2, 1960. He was convicted and sentenced to a term of imprisonment of not more than one year to run from August 15, 1960. In 1961 he was indicted on five counts of burglary allegedly committed on May 29, June 2, July 3, July 9, and July 26, 1960. He was convicted and sentenced on each count to one year imprisonment, some of which sentences were to be consecutive and some concurrent. He was imprisoned at the Maryland Correctional Institution at Hagerstown, Maryland, from September 28, 1960, until February 4, 1963. Since he had not attained 16 years of age at the time of the incidents on May 29, 1960, and June 2, 1960, "[h]e was waived to the jurisdiction of the Criminal Court of Baltimore to be tried as an adult offender on th[o]se indictments pursuant to a waiver order signed by the Honorable Charles E. Moylan [of the Division for Juvenile Causes of the Circuit Court of Baltimore City on] February 23, 1961. No hearing was held prior to the signing of the waiver order," nor was Wiggins physically present in the Circuit Court of Baltimore City "either immediately preceding or at the time the above mentioned waiver order was signed and [he] was at no time brought before that court in connection with the offenses for which he was waived." He was then incarcerated as a convicted adult felon.

Wiggins filed a bill of complaint in the Circuit Court of Baltimore City against the State of Maryland and the Clerk of the Criminal Court of Baltimore in which he requested the court "to declare that the aforementioned convictions of [him] are a nullity and that [he] may suffer no legal disabilities as a result of such convictions." He also asked the court "to permanently enjoin defendants from keeping or maintaining any record whatsoever stating or in any way indicating that [Wiggins] was convicted of the burglary offenses" previously mentioned. That court ruled against Wiggins. He appealed. The Court of Special Appeals in *Wiggins v. State,* 22 Md. App. 291, 324 A. 2d 172 (1974), considered and rejected the points here raised. We granted certiorari in order that we might consider the important constitutional question here involved.

Although we set forth much of the background of the Maryland statutes relative to juveniles in *Matter of Anderson,* 272 Md. 85, 94-95, 321 A. 2d 516 (1974), we shall again refer to that background for a better understanding of this controversy. Originally, juvenile matters in Maryland were handled by specially designated justices of the peace rather than by judges of courts of general trial jurisdiction. The Maryland Constitution never required justices of the peace to be lawyers and most of them were not lawyers. Provision for a special judicial officer to handle juvenile matters came into Maryland law with passage of Chapter 611 of the Acts of 1902 authorizing the appointment in Baltimore City of a "Magistrate for Juvenile Causes" to "have exclusive jurisdiction of all cases of trial, or commitment for trial, or of commitment to any reformatory or other institution, of all minors under sixteen years of age . . . ."

In 1940 Governor Herbert R. O'Conor appointed a Juvenile Delinquency Commission "to consider the whole field of the treatment of juvenile delinquency in Maryland, and to report its findings to the Governor and to the General Assembly at its session of 1941." It pointed out that "Baltimore [was] the only large city in the United States whose Juvenile Court judges [were] Justices of the Peace." It

recommended "an enabling amendment to empower the Legislature to establish a Juvenile Court in Baltimore City." Chapter 824 of the Acts of 1941 proposed to the people of Maryland a constitutional amendment creating "[a] Juvenile Court . . . for Baltimore City." The amendment also would have authorized the General Assembly to "establish a Juvenile Court for any other incorporated city or town or any county of the State." This proposed amendment was rejected by the electorate.

The Governor was authorized by Chapter 323 of the Acts of 1931, which became Code (1939) Art. 52, §§ 83-91, inclusive, to appoint "an additional justice of the peace for each county to be known as the magistrate for juvenile causes for the particular county." This provision did not apply to Baltimore City nor to Allegany, Washington, and Baltimore Counties. The person so appointed was to be "at least twenty-five years of age [and] a member of the bar of the Court of Appeals of Maryland." There was the further proviso that "no such appointment sh[ould] be made in any county until the County Commissioners sh[ould] have provided a salary for such Justice, and sh[ould] have notified the Governor that such provision ha[d] been made." [1] Such justices of the peace were to "have exclusive jurisdiction where jurisdiction [was] given by law to any justice of the peace or magistrate for criminal causes in all cases of trial, or commitment for trial, or commitment to any juvenile institution of any minor under the age of sixteen (16) years." By Code (1924) Art. 52, § 12 justices of the peace of the State except in Baltimore City, Talbot, Harford, Montgomery, and Frederick Counties, were granted "jurisdiction to hear, try and determine all cases

---

1. It is obvious that the counties of the State were not particularly interested in implementing at their expense such a juvenile system for *Maryland Manual 1943-1944* reflects the existence for terms expiring May, 1945, of magistrates for juvenile causes in Allegany, Montgomery, and Washington Counties only. Separate statutes covered Allegany and Washington Counties. *See* Code of Public Local Laws (1930) Art. 1, §§ 370-375 and Art. 22, §§ 558-578, originally enacted in 1914 and 1924, respectively. These statutes mandated the appointment and set the compensation as did Code (1939, 1943 Cum. Supp.) Art. 52, § 83A, enacted as Chap. 147 of the Acts of 1943, for Montgomery County.

involving the charge of any offense, crime or misdemeanor, not punishable by confinement in the Penitentiary or involving a felonious intent, which m[ight] be committed within their respective Counties" as well as "all prosecutions or proceedings for the recovery of any penalty for doing or omitting to do any act within their respective Counties, the doing of which or the omission to do which, [was] made punishable under the laws of this State by any pecuniary fine or penalty, or by imprisonment in jail or in the Maryland House of Correction, all of which acts or omissions [were] [t]hereby declared to be criminal offenses . . . ." From this it will be seen that from 1931 in most, but not all, of the State, if a county in its wisdom elected to fund the office of magistrate for juvenile causes then there was to be such a magistrate who then would have exclusive jurisdiction of those prosecutions of persons under 16 which involved misdemeanors, but not felonies. By Chapter 807 of the Acts of 1941 this 16 year provision was raised to 18 years with the further provision that the magistrate should "have concurrent jurisdiction in such cases with the Circuit Courts for the several counties where the minor [was] eighteen (18) years of age but under the age of twenty-one (21)."

The appointment by Governor O'Conor of the Juvenile Delinquency Commission in 1940 had been followed by his appointment on November 1, 1941, of a Commission on the Judiciary Article of the Constitution of Maryland, commonly known as the "Bond Commission" for its chairman, Chief Judge Carroll T. Bond of this Court. The Bond Commission was of the opinion that in order to avoid the multiplication of courts a juvenile court in Baltimore City should be a branch of the Supreme Bench and that a judge of that bench qualified for such work should continue to serve in juvenile matters without rotation in order to promote the most effective administration.[2] The *Report of the Maryland Commission on Juvenile Delinquency* 73 (1943) stated that it "accept[ed] the view that our present courts, that is the Supreme Bench in Baltimore City and the Circuit

---

. **2.** *See* Interim Report of the Commission on the Judiciary Article of the Constitution of Maryland 11 (1942) and Report of the Commission on the Judiciary Article of the Constitution of Maryland 12 (1942).

Courts in the several counties, have inherent jurisdiction to secure to every child in the State proper care and guidance if he or she is lacking in same, whether due to neglect, dependency, delinquency, feeble-mindedness or to a combination of two or more of these causes." It then went on to recommend:

> "Creation of a juvenile court in Baltimore city and in each county or at least in each Judicial Circuit, that shall have (1) original, exclusive jurisdiction, unless expressly waived by such courts in favor of the criminal courts, over children up to 16 years of age in all cases of delinquency, dependency, neglect, abandonment or feeble-mindedness; (2) original jurisdiction to determine paternity in disputed cases; (3) original, exclusive jurisdiction to try, subject to the right of trial by jury unless waived, any parent, guardian or other adult for any wilful act or omission contributing to, encouraging or tending to cause any condition bringing a child within the jurisdiction of a juvenile court, as just defined; and if found guilty, to sentence any such person for any such act or omission as a misdemeanor, to pay a fine or to imprisonment, or both, within limits to be fixed by statute; such juvenile court in Baltimore city to be a part of the Supreme Bench of Baltimore City, and such juvenile courts in the Counties to be parts of the existing circuit courts." *Id.* at 85-86.

The General Assembly acted upon this report by enacting Chapter 818 of the Acts of 1943 providing for the exercise of juvenile jurisdiction by the Circuit Court of Baltimore City. Thus, for the first time in Maryland a judge, as distinguished from a justice of the peace, had jurisdiction in juvenile matters. The term "child" was defined as "a person under the age of sixteen years and subject to the jurisdiction of the court." A delinquent child included an individual "who violate[d] any law or ordinance, or who commit[ted] any act which, if committed by an adult, would be a crime not

punishable by death or life imprisonment . . . ." Unless the judge "in his discretion waive[d] jurisdiction and order[ed] such child held for action under the regular procedure that would follow if such act or acts had been committed by an adult," he was granted "original, exclusive jurisdiction concerning any child who [was] . . . delinquent . . . ." It is to be noted that as of the time of the passage of this act no provision was made in the counties of Maryland for a juvenile court other than the earlier provision we have mentioned for a justice of the peace in those instances in which the counties saw fit to fund the salary for such justice of the peace as a magistrate for juvenile causes.

Those from without the state who have occasion to read this opinion should understand that the circuit courts of the 23 counties of Maryland are the courts of general trial jurisdiction created by Maryland Constitution Art. IV, § 20. The Constitution provides for Baltimore City what is "styled [as] the Supreme Bench of Baltimore City." Under Art. IV, § 27, it includes the various trial courts of the City of Baltimore. The sum total of the jurisdiction of those courts equals that of the circuit courts for the various counties. The Criminal Court of Baltimore has the same general criminal trial jurisdiction as the circuit courts in the counties of Maryland. The Circuit Court of Baltimore City has the equity jurisdiction vested in the circuit courts for the counties.

In 1945 juvenile jurisdiction reached the circuit courts for the counties with the enactment of Chapter 797 of the Acts of that year which became Code (1939, 1947 Cum. Supp.) Art. 26, §§ 48A-48U. It was not applicable to Baltimore City nor to Washington, Allegany, and Montgomery Counties. Other than for the fact that it defined a child as a person under the age of 18 years with corresponding modifications elsewhere in the act, the 1943 and 1945 acts are similar, including the fact that § 48D of the 1945 act provided that a "[j]udge, after full investigation, m[ight] in his discretion waive jurisdiction and order such child held for action under the regular procedure that would follow if such act or acts had been committed by an adult." It is to be specifically

noted that neither of these acts sets forth any definite criteria to be taken into consideration by such a judge in waiving jurisdiction. It was under such broad powers that juvenile jurisdiction as to Wiggins was waived relative to the crimes he was said to have committed prior to reaching his 16th birthday. By Chapter 127 of the Acts of 1966 the exemption in the statewide act for Baltimore City was eliminated to take effect June 1, 1969, so that after that date only Montgomery County would not be included in the statewide act.[3]

The Legislative Council appointed a subcommittee on juvenile causes in 1968. Its report recommended extensive revision in the juvenile law. It formed the basis for Chapter 432 of the Acts of 1969. Most of Code (1957, 1973 Repl. Vol.) Art. 26, §§ 51-71, was enacted by that chapter. It continued the exemption from the subtitle for Montgomery County. There was no difference, however, between the act for Montgomery County and the statewide act relative to age. As introduced the act would have defined a child as a person who had not reached his 18th birthday except in Baltimore City where until July 1, 1971, this meant a person who had not reached his 16th birthday. The General Assembly in its wisdom elected to cut that date back to July 1, 1970. Chapter 730 of the Acts of 1970, however, changed the phase out to 1971. In this regard it is interesting to note that the Bond Commission in its interim report in 1942 did not propose a different age limit for Baltimore City, but recommended that "the jurisdiction [of the juvenile courts] be exclusive over all proceedings involving crimes or offenses by minors below the age of 18 years . . . ."

As indicated, prior to the 1969 enactment nothing was spelled out in the statutes as to what should be considered by a juvenile judge in determining whether or not to waive juvenile jurisdiction and permit an individual to be tried under the usual criminal procedure. Code (1974) § 3-816 (c) of the Courts and Judicial Proceedings Article today

---

3. In *Anderson*, 272 Md. at 97, the author of this opinion failed to note the effective date of this act as June 1, 1969.

specifies that in making a determination as to waiver of jurisdiction the court shall consider the age of the child; the mental and physical condition of the child; the child's amenability to treatment in any institution, facility, or program available to delinquents; the nature of the offense; and the public safety. No case reached this Court under the prior statutes. It is presumed, however, that in exercising their discretion factors such as these were considered by juvenile judges.

The genesis of the modern retroactivity doctrine in criminal litigation is *Linkletter v. Walker*, 381 U. S. 618, 85 S. Ct. 1731, 14 L.Ed.2d 601 (1965), in which Mr. Justice Clark said for the Court:

> "[T]he accepted rule today is that in appropriate cases the Court may in the interest of justice make the rule prospective. . . .
>
> "[T]he Constitution neither prohibits nor requires retrospective effect. As Justice Cardozo said [in *Great Northern Ry. Co. v. Sunburst Oil & Refining Co.*, 287 U. S. 358, 364, 53 S. Ct. 145, 77 L. Ed. 360 (1932)], 'We think the federal constitution has no voice upon the subject.' " *Id.* at 628-29.

In *Linkletter*, the Court had before it the question of whether the holding in *Mapp v. Ohio*, 367 U. S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961), that evidence seized in violation of the search and seizure provisions of the Fourth Amendment was required to be excluded in state prosecutions by virtue of the Due Process Clause of the Fourteenth Amendment, should operate retrospectively upon cases finally decided in the period prior to *Mapp* in reliance upon the prior decision of *Wolf v. Colorado*, 338 U. S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949), which *Mapp* overruled. Mr. Justice Clark carefully traced for the Court the history and theory of the problem presented. He pointed out that "[a]t common law there was no authority for the proposition that judicial decisions made law only for the future," a view concurred in by Blackstone who "stated the

rule that the duty of the court was not to 'pronounce a new law, but to maintain and expound the old one,' 1 Blackstone, Commentaries 69 (15th ed. 1809)." [4] He further observed that "Austin maintained that judges do in fact do something more than discover law; they make it interstitially by filling in with judicial interpretation the vague, indefinite, or generic statutory or common-law terms that alone are but empty crevices of the law. Implicit in such an approach is the admission when a case is overruled that the earlier decision was wrongly decided." He referred at 625 to *Chicot County Drainage Dist. v. Baxter State Bank*, 308 U. S. 371, 60 S. Ct. 317, 84 L. Ed. 329 (1940), and observed that Chief Justice Hughes in that case "reasoned [for the Court] that the actual existence of the law prior to the determination of unconstitutionality 'is an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration.' He laid down the rule that the 'effect of the subsequent ruling as to invalidity may have to be considered in various aspects.' [308 U. S.] at 374." Justice Clark concluded:

"Under our cases it appears (1) that a change in law will be given effect while a case is on direct review, [*United States v.*] *Schooner Peggy*, [1 Cranch 103, 2 L.Ed. 49 (1801)],[11] and (2) that the effect of the subsequent ruling of invalidity on prior final judgments when collaterally attacked is subject to no set 'principle of absolute retroactive invalidity' but depends upon a consideration of 'particular relations . . . and particular conduct . . . of rights claimed to have become vested, of status, of prior determinations deemed to have finality'; and 'of public policy in the light of the nature both of the statute and of its previous

---

4. By a footnote he observed that "[w]hile Blackstone is always cited as the foremost exponent of the declaratory theory, a very similar view was stated by Sir Matthew Hale in his History of the Common Law which was published 13 years before the birth of Blackstone. Gray, Nature and Sources of the Law 206 (1st ed. 1909)."

application.' *Chicot County Drainage Dist. v. Baxter State Bank, supra,* [308 U. S.] at 374.

---

"¹¹ Accord, *Carpenter v. Wabash R. Co.,* 309 U. S. 23 (1940) (intervening statutory change); *Vandenbark v. Owens-Illinois Glass Co.,* 311 U. S. 538 and cases cited at 541-542 (1941); *Dinsmore v. Southern Express Co.,* 183 U. S. 115, 120 (1901) (intervening statutory change); *Crozier v. Krupp,* 224 U. S. 290, 308 (1912) (intervening statutory change)." *Id.* at 627.

---

The Court then enunciated a three-pronged test to aid in the resolution of the problem:

> "We believe that the existence of the *Wolf* doctrine prior to *Mapp* is 'an operative fact and may have consequences which cannot justly be ignored. The past cannot always be erased by a new judicial declaration.' *Chicot County Drainage Dist. v. Baxter State Bank, supra,* at 374. The thousands of cases that were finally decided on *Wolf* cannot be obliterated. The 'particular conduct, private and official,' must be considered. Here 'prior determinations deemed to have finality and acted upon accordingly' have 'become vested.' And finally, 'public policy in the light of the nature both of the . . . [*Wolf* doctrine] and of its previous application' must be given its proper weight. *Ibid.* In short, we must look to the purpose of the *Mapp* rule; the reliance placed upon the *Wolf* doctrine; and the effect on the administration of justice of a retrospective application of *Mapp*." *Id.* at 636.

It will be seen that the Court in its opinion relied heavily upon *Chicot County* which was based on the doctrine of res judicata. In that case the Court was faced with the question of whether to give its decision in *Ashton v. Cameron County District,* 298 U. S. 513, 56 S. Ct. 892, 80 L. Ed. 1309 (1936), retroactive application. In *Ashton* the Court held unconstitutional the 1934 amendment to the Bankruptcy Act

which permitted political subdivisions of a state to readjust their debts in certain circumstances under the jurisdiction of United States District Courts. Municipal debts had been readjusted under this act in *Ashton* and in a case involving Chicot County Drainage District. In *Ashton* the affected bondholders challenged the constitutionality of the act and won. Thus, the act which conferred the jurisdiction under which the debts of the drainage district had been adjusted was held invalid. The challenge in *Ashton* had been in the adjustment proceeding. No such challenge had been made in the proceeding involving the bonds of the Chicot County Drainage District and the time for appeal had expired. Nevertheless, some bondholders of that drainage district invoked the holding in *Ashton* and attempted to recover the full amount on the bonds there in controversy. The drainage district pleaded the readjustment decree of the district court as res judicata. The bondholders, however, relied on *Norton v. Shelby County*, 118 U. S. 425, 6 S. Ct. 1121, 30 L. Ed. 178 (1886), and contended that since the 1934 act granting jurisdiction had been held unconstitutional in *Ashton* in the words of *Norton* it "confers no right; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." The Supreme Court disagreed and barred the bondholders from collecting.

We glean from the Supreme Court cases that there are three circumstances in which a retrospective application is mandated, (1) where the old rule affected the integrity of the fact-finding process, (2) where no trial was constitutionally permissible, and (3) where the punishment is not constitutionally permissible. In the absence of one of those three circumstances, then the three-pronged *Linkletter* test is applicable.

Cases involving the integrity of the fact-finding process are represented by the plurality opinion in *Williams v. United States*, 401 U. S. 646, 91 S. Ct. 1148, 28 L.Ed.2d 388 (1971), relied upon by the Fourth Circuit in *Woodall*. In *Williams* Mr. Justice White said for himself and three other justices:

"Where the major purpose of new constitutional doctrine is to overcome an aspect of the criminal trial which substantially impairs its truth-finding function and so raises serious questions about the accuracy of guilty verdicts in past trials, the new rule has been given complete retroactive effect.[6] Neither good-faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to require prospective application in these circumstances.

"It is quite different where the purpose of the new constitutional standard proscribing the use of certain evidence or a particular mode of trial is not to minimize or avoid arbitrary or unreliable results but to serve other ends. In these situations the new doctrine raises no question about the guilt of defendants convicted in prior trials.

---

"[6] See, *e.g., Arenault v. Massachusetts*, 393 U. S. 5 (1968) (giving retroactive effect to the right to counsel provided in *White v. Maryland*, 373 U. S. 59 (1963)); *McConnell v. Rhay*, 393 U. S. 2 (1968) (giving retroactive effect to the right to counsel provided in *Mempa v. Rhay*, 389 U. S. 128 (1967)); *Berger v. California*, 393 U. S. 314 (1969) (giving retroactive effect to *Barber v. Page*, 390 U. S. 719 (1968)); *Roberts v. Russell*, 392 U. S. 293 (1968) (giving retroactive effect to *Bruton v. United States*, 391 U. S. 123 (1968)); *Jackson v. Denno*, 378 U. S. 368 (1964); *Gideon v. Wainwright*, 372 U. S. 335 (1963); *Douglas v. California*, 372 U. S. 353 (1963); *Griffin v. Illinois*, 351 U. S. 12 (1956)." *Id.* at 653.

---

In *Williams* the Court held that its decision in *Chimel v. California*, 395 U. S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969), which narrowed the scope of permissible searches incident to arrest, was not to be retroactively applied to any search antedating the decision in *Chimel*, decided June 23,

1969. This decision, like *Linkletter*, emphasizes that in search and seizure cases the evidence is excluded because of illegal police conduct and not because of its unreliability. Therefore, since the new rule is aimed at deterrence, there is no reason for retroactive application.

It will be noted that the cases listed by Mr. Justice White in footnote 6 of his plurality opinion had a significant effect on the fact-finding process and retroactive application resulted. For instance, in *Berger v. California*, 393 U. S. 314, 89 S. Ct. 540, 21 L.Ed.2d 508 (1969), the Court gave retroactive effect to its holding that the absence of a witness from the jurisdiction does not justify use at trial of his preliminary hearing testimony unless the state has first made a good faith effort to secure the presence of the witness. This could have a significant effect on the integrity of the fact-finding process since use of such testimony would deprive a defendant of his Sixth Amendment right to confront and cross-examine the witnesses against him, an essential ingredient in our adversary process of truth determination.

*Gosa v. Mayden*, 413 U. S. 665, 93 S. Ct. 2926, 37 L.Ed.2d 873 (1973), presents a case almost identical with the problem faced here. The Court there had before it the question of whether its holding in *O'Callahan v. Parker*, 395 U. S. 258, 89 S. Ct. 1683, 23 L.Ed.2d 291 (1969), should be prospective or retrospective in its application. *O'Callahan* held that a court-martial convened under the Articles of War, 10 U.S.C. § 801 *et seq.*, did not have jurisdiction to try a member of the Armed Forces who was charged with commission of a crime cognizable in a civilian court and having no military significance, alleged to have been committed off-post and while on leave, thus depriving such an individual of his constitutional rights to indictment by a grand jury and trial by a petit jury in a civilian court. A key passage in the plurality opinion of Mr. Justice Blackmun is:

> "We must necessarily also consider the impact of a retroactivity holding on the interests of society when the new constitutional standard promulgated does not bring into question the accuracy of prior

adjudications of guilt. Wholesale invalidation of convictions rendered years ago could well mean that convicted persons would be freed without retrial, for witnesses, particularly military ones, no longer may be readily available, memories may have faded, records may be incomplete or missing, and physical evidence may have disappeared. Society must not be made. to tolerate. a . result. of that kind when there is no significant question concerning the accuracy of the process by which judgment was rendered or, in other words, when essential justice is not involved.

"We conclude that the purpose to be served by *O'Callahan,* the reliance on the law as it stood before that decision, and the effect of a holding of retroactivity, all require that *O'Callahan* be accorded prospective application only. We so hold." *Id.* at 685.

Mr. Justice Douglas concurred in the result in a companion case of *Gosa.* He advocated reargument of *Gosa,* however, on the issue of res judicata. He said he had "reached no position on the merits and would reserve judgment until the issue was fully explored on reargument," but what he set forth in his opinion were "the reasons why *res judicata* arguably should lead to an affirmance . . . ." Two paragraphs of his opinion reflect a striking similarity to the case at hand:

"Here the question is whether a civilian, rather than a military, tribunal should have tried him. Does the question whether the 'jurisdiction' of the military tribunal can be contested at this late date turn on whether *res judicata* bars that inquiry?

"Petitioner Gosa in the review of his conviction by the military tribunal never raised the question raised in *O'Callahan.* If he was 'constitutionally immune from punishment' in any court, we would have the problem presented in *United States v. U. S. Coin & Currency,* 401 U. S. 715, 723-724. But

petitioner was not tried by a kangaroo court or by eager vigilantes but by military authorities within the framework established by Congress in the Uniform Code of Military Justice." *Id.* at 689-90. (Footnotes omitted.)

Wiggins relies upon *Robinson v. Neil,* 409 U. S. 505, 93 S. Ct. 876, 35 L.Ed.2d 29 (1973), as compelling retrospective application of *Long* on the theory that the jurisdiction previously exercised in this instance by the Criminal Court of Baltimore was unconstitutional. Such a contention was advanced and rejected in *Gosa. Robinson* does not support the conclusion that retrospective application is compelled here. In *Robinson* the Court unanimously held that *Waller v. Florida,* 397 U. S. 387, 90 S. Ct. 1184, 25 L.Ed.2d 435 (1970), was to be given "full retroactive effect." *Waller* held that the double jeopardy clause bars state and municipal prosecutions for the same act. Mr. Justice Rehnquist there said for the Court:

> "*Linkletter* indicated, for instance, that only those procedural rules affecting 'the very integrity of the factfinding process' would be given retrospective effect. 381 U. S., at 639. In terms of some nonprocedural guarantees, this test is simply not appropriate. In *Furman v. Georgia,* 408 U. S. 238 (1972), for example, this Court held that in the situation there presented imposition of the death penalty was not constitutionally permissible. Yet, while this holding does not affect the integrity of the factfinding process, we have not hesitated to apply it retrospectively without regard to whether the rule meets the *Linkletter* criteria. *E.g., Walker v. Georgia,* 408 U. S. 936.

> "The prohibition against being placed in double jeopardy is likewise not readily susceptible of analysis under the *Linkletter* line of cases. Although the Court has not handed down a fully reasoned opinion on the retroactivity of *Benton v. Maryland,* [395 U. S. 784, 89 S. Ct. 2056, 23 L.Ed.2d

707 (1969),] it has indicated that it is retroactive without examination of the *Linkletter* criteria. *North Carolina v. Pearce*, 395 U. S. 711 (1969); *Ashe v. Swenson*, 397 U. S. 436, 437 n. 1 (1970). These decisions do not directly control the question of whether *Waller* should be given retrospective effect but they bear upon its disposition.

"The guarantee against double jeopardy is significantly different from procedural guarantees held in the *Linkletter* line of cases to have prospective effect only. While this guarantee, like the others, is a constitutional right of the criminal defendant, its practical result is to prevent a trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of a trial. A number of the constitutional rules applied prospectively only under the *Linkletter* cases were found not to affect the basic fairness of the earlier trial, but to have been directed instead to collateral purposes such as the deterrence of unlawful police conduct, *Mapp v. Ohio, supra.* In *Waller*, however, the Court's ruling was squarely directed to the prevention of the second trial's taking place at all, even though it might have been conducted with a scrupulous regard for all of the constitutional procedural rights of the defendant.

"We would not suggest that the distinction that we draw is an ironclad one that will invariably result in the easy classification of cases in one category or the other. The element of reliance embodied in the *Linkletter* analysis will not be wholly absent in the case of constitutional decisions not related to trial procedure, as indeed this case when contrasted with *Furman* illustrates." *Id.* at 508-09.

Similarly, in *United States v. U. S. Coin & Currency*, 401 U. S. 715, 91 S. Ct. 1041, 28 L.Ed.2d 434 (1971), the Court considered the effect to be given *Marchetti v. United States*, 390 U. S. 39, 88 S. Ct. 697, 19 L.Ed.2d 889 (1968), and *Grosso*

*v. United States,* 390 U. S. 62, 88 S. Ct. 709, 19 L.Ed.2d 906 (1968), "which precluded the criminal conviction of gamblers who properly assert their privilege against self-incrimination as a ground for their failure to comply with [the reporting] aspects of the gambling tax law." The Court held:

> "In the case before us, however, even the use of impeccable factfinding procedures could not legitimate a verdict decreeing forfeiture, for we have held that the *conduct* being penalized is constitutionally immune from punishment. No circumstances call more for the invocation of a rule of complete retroactivity." *Id.* at 724. (Emphasis added.)

As noted, Mr. Justice Rehnquist pointed out in *Robinson* an example of giving retrospective effect to a decision relative to punishment, the application in *Walker v. Georgia,* 408 U. S. 936, 92 S. Ct. 2845, 33 L.Ed.2d 753 (1972), of *Furman v. Georgia,* 408 U. S. 238, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972). A similar application was made in footnote 22 of *Witherspoon v. Illinois,* 391 U. S. 510, 88 S. Ct. 1770, 20 L.Ed.2d 776 (1968), in which the Court condemned a jury selection procedure which excluded veniremen who voiced even a general objection to the death penalty or expressed religious scruples against its infliction. In that case the Court concluded that no defendant could constitutionally be put to death at the hands of a tribunal so selected because they were "uncommonly willing to condemn a man to die."

In *Woodall* the Fourth Circuit said:

> "We think the question of retroactivity is controlled by our decision in Kemplen v. State of Maryland, 428 F. 2d 169 (4th Cir. 1970). It is true, as the state contends, that the unconstitutional treatment of petitioners does not relate to the accuracy of the fact finding function of the judicial process. But as we said in *Kemplen,* the normal waiver proceeding is a critical point in the criminal proceedings against a juvenile. It is 'the only

opportunity an accused has to plead the defense of his diminished responsibility as a juvenile.' *Kemplen*, at 177. To deny juveniles in Baltimore the opportunity of such a defense and to allow it to all other juveniles in Maryland seems to us so fundamentally unfair as to impeach the validity of the 'adult' proceedings and render unreliable the guilty verdicts obtained in these proceedings. We hold, therefore, that Long v. Robinson, 436 F. 2d 1116 (4th Cir. 1971), is to be retroactively applied." *Id.* at 465 F. 2d 52.

*Kemplen v. State of Maryland,* 428 F. 2d 169 (4th Cir. 1970), cited by the Fourth Circuit in *Woodall,* concerned only the question, as Judge Craven put it for that court, of "whether a state may, in enforcing its criminal laws, elect to proceed against a juvenile as if he were an adult without his having counsel at the 'waiver hearing' in the juvenile court." He was held entitled to such counsel and the holding was directed to be applied retroactively.

As we have indicated, the Fourth Circuit in *Woodall* concluded that conviction of an individual such as Wiggins under our prior procedure is "so fundamentally unfair as to impeach the validity of the 'adult' proceedings and render unreliable the guilty verdicts obtained in th[o]se proceedings." We see it somewhat differently. The waiver hearing is not intended as an opportunity for a juvenile "to plead a defense of his diminished responsibility," but to afford an opportunity for a judge to determine the fitness of the juvenile for rehabilitative measures giving due consideration to the safety of the public and applying the factors noted in Code (1974) § 3-816 (c) of the Courts and Judicial Proceedings Article. The waiver proceeding is in no way concerned with the ultimate fact-finding determination of whether the accused did nor did not commit the act he is said to have committed. The fact that there has been no waiver is not a matter for consideration in the juvenile proceeding in determining whether the child committed the act in question and thus is delinquent. Likewise, in a trial under adult procedures the fact of waiver is not an element

for consideration in determining guilt or innocence. The same evidence presented in a juvenile proceeding or in a regular criminal trial should lead to the same conclusion, although, as we shall point out, at the time of Wiggins' trials his rights might have been more jealously guarded constitutionally in a regular criminal trial than in a trial under juvenile procedure. The basic difference, however, between trial as an adult and trial as a juvenile lies not in the fact-finding processes, but in the procedures looking to rehabilitation after a determination that an individual did in fact commit acts which were violations of the criminal statutes of this State.

Wiggins was indicted by the Grand Jury of Baltimore City. He was accorded the right of trial by a jury. Since he was accused of a felony, he became entitled to the appointment of counsel on his behalf as had been the Maryland rule for many years prior to the decision of the Supreme Court in *Gideon v. Wainwright,* 372 U. S. 335, 83 S. Ct. 792, 9 L.Ed.2d 799 (1963). *See, e.g., Hill v. State,* 218 Md. 120, 145 A. 2d 445 (1958), and *Coates v. State,* 180 Md. 502, 512, 25 A. 2d 676 (1942). At the time of the filing of the charges against him he would not have been entitled to the assignment of counsel in a juvenile proceeding. His trials in the Criminal Court of Baltimore were presided over by a judge of the Supreme Bench of Baltimore City, just as in the Juvenile Division of the Circuit Court of Baltimore City a Supreme Bench judge would have sat on the issue of delinquency had the charges against Wiggins been in the juvenile court. He was entitled in the Criminal Court of Baltimore to all of the protection of such a trial, including the right to have the rules of evidence made applicable to the proceeding. Four years before the Supreme Court's decision in *In re Gault,* 387 U. S. 1, 87 S. Ct. 1428, 18 L.Ed.2d 527 (1967), this Court held in *In Matter of Cromwell,* 232 Md. 409, 415, 194 A. 2d 88 (1963), that although juvenile proceedings may be conducted without strict regard for the usual court rules, "we think there is at least a minimum standard of fairness that must be observed." That standard precluded "the introduction of . . . evidence, without

advance notice and in a form that prevented cross-examination and clarification," an act which the Court said "was prejudicial and unfair," leading to a reversal and a remand of the case for further proceedings. What had there been done by the State was summarized by Judge Henderson for the Court:

> "Moreover, the State put in evidence, over objection, summaries of reports by school principals and teachers, that had been gathered by the school superintendent, although the persons making the reports were not present for cross-examination. The original reports were not produced. Not only were some of the statements in these reports highly derogatory, but the statements as a whole were equivocal. At one point the statements as to Dinez speak of an unacceptable behaviour pattern, at another of cooperation in the current year. In the case of Dwight, the statements speak at one point of emotional disturbance, at another of marked improvement. In this case there was also a report from the Health Department, that he had been referred 'after being suspected' of a serious sexual offense. Yet there was no finding on the point, and nothing but a notation that he kept appointments irregularly. Apart from being hearsay, the report was irrelevant and misleading."
> *Id.* at 415.

It is common knowledge among those involved with juvenile cases prior to the decision of this Court in *Cromwell* that evidence similar to that rejected by the Court in *Cromwell* had been freely admitted in juvenile proceedings. Thus, had Wiggins been before the Circuit Court of Baltimore City for a determination of whether he was a juvenile delinquent the truth-finding processes would not, as of the time of his conviction, have been as carefully carried out as they were in the Criminal Court of Baltimore.

Returning to the three-pronged test enunciated by the Supreme Court in *Linkletter*, the purpose of the *Long* rule

was to ensure that thenceforth all individuals in Maryland under the age of 18 years would be dealt with on the same basis, regardless of the geographical location of their alleged violations of the criminal law of the State. It is evident that for a period of 25 years, from the time of the enactment of the 1945 general law on juvenile procedure until the decision of the United States District Court for the District of Maryland in *Long,* the youth of Baltimore City were regarded by the General Assembly as reaching that state of maturity where they should be prosecuted as adults two years earlier than their peers in the remainder of the State.[5] We have no way of acquiring accurate statistics on the number of persons between 16 and 18 so prosecuted, but considering the fact that during all of those years the population of Baltimore City as reflected by the figures of the United States Bureau of Census was in excess of 900,000 people, it seems safe to say that the number of such individuals is numbered in the hundreds and probably in the thousands. For a number of years what was styled "Part III of the Criminal Court of Baltimore" was designated as "the Youth Court," intended to deal with those defendants in criminal cases who were between the ages of 16 and 20 years, inclusive. The Report of State's Attorney's office of Baltimore City for the year 1961, the year in which most of the convictions of Wiggins took place, reflects at page 15 convictions in 1,104 youth court trials and convictions of 1,443 defendants. Selecting yet another year at random, the report for the year 1966 at page 33 shows 1,285 individual youth defendants convicted. Then selecting at random the 1966-1967 Annual Report of the Administrative Office of the Courts, one notes at page 67 that 10,161 criminal cases were filed during that fiscal year in the Criminal Court of Baltimore and 8,978 such cases were terminated. The same

---

5. Of course, as the dissent notes, the place in which an individual committed an act bringing him within the jurisdiction of the court, *not* his place of residence, was determinative of whether he was proceeded against as a juvenile or as an adult. It is probable, however, that the General Assembly believed that the vast majority of such acts committed in Baltimore City were committed by persons residing in that city and that the vast majority of such acts committed in the counties of Maryland were committed by persons residing in the counties.

report reflects that for the same period 7,329 juvenile causes were filed in Baltimore City and 7,170 were terminated. We are not to be understood as implying the number of those criminal cases or the number of youth court cases which would involve young people between the ages of 16 and 18. However, when those youth court figures are read alongside of the figures showing the vast volume of criminal and juvenile matters arising in Baltimore City they give rise to an inference that in any given year out of the 25 a very substantial number of persons between the ages of 16 and 18 would have been prosecuted as adults in Baltimore City.

On the issue of reliance we find persuasive the language used by the Supreme Court in *Stovall v. Denno,* 388 U. S. 293, 87 S. Ct. 1967, 18 L.Ed.2d 1199 (1967):

> "The unusual force of the countervailing considerations strengthens our conclusion in favor of prospective application. The law enforcement officials of the Federal Government and of all 50 States have heretofore proceeded on the premise that the Constitution did not require the presence of counsel at pretrial confrontations for identification. Today's rulings were not foreshadowed in our cases; no court announced such a requirement until *Wade* was decided by the Court of Appeals for the Fifth Circuit, 358 F. 2d 557. The overwhelming majority of American courts have always treated the evidence question not as one of admissibility but as one of credibility for the jury. Wall, Eye-Witness Identification in Criminal Cases 38. Law enforcement authorities fairly relied on this virtually unanimous weight of authority, now no longer valid, in conducting pretrial confrontations in the absence of counsel. It is, therefore, very clear that retroactive application of *Wade* and *Gilbert* 'would seriously disrupt the administration of our criminal laws.' *Johnson v. New Jersey,* [384 U. S. 719], at 731. In *Tehan v. Shott,* [382 U. S. 406], we thought it persuasive against retroactive application of the no-comment

rule of *Griffin v. California,* 380 U. S. 609, that such application would have a serious impact on the six States that allowed comment on an accused's failure to take the stand. We said, 'To require all of those States now to void the conviction of every person who did not testify at his trial would have an impact upon the administration of their criminal law so devastating as to need no elaboration.' 382 U. S., at 419. That impact is insignificant compared to the impact to be expected from retroactivity of the *Wade* and *Gilbert* rules. At the very least, the processing of current criminal calendars would be disrupted while hearings were conducted to determine taint, if any, in identification evidence, and whether in any event the admission of the evidence was harmless error. Doubtless, too, inquiry would be handicapped by the unavailability of witnesses and dim memories. We conclude, therefore, that the *Wade* and *Gilbert* rules should not be made retroactive." *Id.* at 299-300.

The fact-finding process insofar as Wiggins was concerned was certainly not contaminated to the degree of that in *Griffin v. California,* 380 U. S. 609, 85 S. Ct. 1229, 14 L.Ed.2d 106 (1965). There Article I, § 13 of the California Constitution provided that "in any criminal case, whether the defendant testifies or not, his failure to explain or to deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury." The jury was so advised. As Mr. Justice Douglas put it for the Supreme Court:

"The prosecutor made much of the failure of petitioner to testify:

'The defendant certainly knows whether Essie Mae had this beat up appearance at the time he left her apartment and went down the alley with her.

'What kind of a man is it that would want to

have sex with a woman that beat up if she was
beat up at the time he left?

'He would know that. He would know how
she got down the alley. He would know how the
blood got on the bottom of the concrete steps.
He would know how long he was with her in
that box. He would know how her wig got off.
He would know whether he beat her or
mistreated her. He would know whether he
walked away from that place cool as a
cucumber when he saw Mr. Villasenor because
he was conscious of his own guilt and wanted
to get away from that damaged or injured
woman.

'These things he has not seen fit to take the
stand and deny or explain.

'And in the whole world, if anybody would
know, this defendant would know.

'Essie Mae is dead, she can't tell you her side
of the story. The defendant won't.' " *Id.* at
610-11.

The Court held "the Fifth Amendment, in its direct
application to the Federal Government and in its bearing on
the States by reason of the Fourteenth Amendment, forbids
either comment by the prosecution on the accused's silence
or instructions by the court that such silence is evidence of
guilt." Nevertheless, as indicated in that portion of *Stovall*
which we have quoted, the Supreme Court in *Tehan v. Shott*,
382 U. S. 406, 86 S. Ct. 459, 15 L.Ed.2d 453 (1966), held
*Griffin* not to have retrospective effect because of the
serious impact upon the administration of criminal law in
the six states where such comment had been allowed.

Let us consider what retrospective application of *Long*
would involve. First of all, there could be literally hundreds
of applications similar to that here made by Wiggins. If
there is to be fairness to society as a whole as well as to
those individuals previously convicted, it would be necessary
for a judge in the Circuit Court of Baltimore City (*not* sitting

in the Division of Juvenile Causes) following the procedures outlined in *Matter of Miles,* 269 Md. 649, 309 A. 2d 289 (1973), to reconstruct the circumstances bearing on the issue of waiver to determine *nunc pro tunc* what a judge under the juvenile act probably would have done had the matter been before him at the time the original charges were brought. He would make his determination using the criteria mentioned in Code (1974) § 3-816 (c) of the Courts and Judicial Proceedings Article (age; mental and physical condition of "child"; "child's" amenability to treatment in an institution, facility, or program available to delinquents; nature of the offense; and the public safety). Obviously, the chancellor would need to have before him all of the data which possibly could be produced which previously had been laid up in the archives relative to the person before him which could have a bearing on this evaluation. The mere passage of time would impose a very substantial burden on the State from the standpoint of locating and assembling this data. The State would be charged with the duty of providing counsel at such waiver hearing for all unable to afford counsel. Then, if waiver were granted a retrial would become necessary. Any prosecution would then be handicapped by dim memories and the unavailability of witnesses, a very substantial burden to the State. Indeed, in the highly mobile society in which we live it is probable that few of the witnesses would be found at the address indicated at the time of the original complaint. Locating some of them would be like hunting the proverbial needle in a haystack. The passage of time makes it inevitable that many of the witnesses are no longer alive. If the additional relief requested by Wiggins to be carried into effect were to be granted, the State's burdens would continue in those instances in which it was unable to successfully retry an accused or in which there was an acquittal in a new trial. The State would be obliged to comb countless records for the purpose of eliminating any reference to such convictions.

In the words of Mr. Justice Douglas in *Gosa,* Wiggins "was not tried by a kangaroo court or by eager vigilantes," but by a regularly constituted court of this State of the highest trial

jurisdiction according to the regular criminal procedure with the right of trial by jury and the assistance of counsel. The State was required to adduce evidence sufficient to prove Wiggins guilty beyond reasonable doubt. We must not lose sight of the sage observation of Mr. Justice Cardozo in *Snyder v. Massachusetts,* 291 U. S. 97, 54 S. Ct. 330, 78 L. Ed. 674 (1934):

> "The law . . . is sedulous in maintaining for a defendant charged with crime whatever forms of procedure are of the essence of an opportunity to defend. Privileges so fundamental as to be inherent in every concept of a fair trial that could be acceptable to the thought of reasonable men will be kept inviolate and inviolable, however crushing may be the pressure of incriminating proof. But justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true.
>
> "... There is danger that the criminal law will be brought into contempt — that discredit will even touch the great immunities assured by the Fourteenth Amendment — if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law, and set the guilty free." *Id.* at 122.

We find persuasive the holding of *Gosa,* the language used by Mr. Justice Douglas in his dissenting opinion in *Gosa,* the holding in *Tehan,* and the holding and language used in *Stovall.* Keeping "the balance true" as between the rights of the individual accused and fairness to the accuser and society at large and balancing the rights of Wiggins and persons such as he against the substantial burden to the State, we find no reason, constitutional or otherwise, for imposing upon the citizenry of the State of Maryland the onus which Wiggins here seeks to impose.

*Judgment affirmed.*

*Eldridge, J., dissenting:*

In my view, the holding of *Long v. Robinson,* 316 F. Supp. 22 (D. Md. 1970), *aff'd,* 436 F. 2d 1116 (4th Cir. 1971), should be applied retroactively so as to grant relief in the present case. *Long v. Robinson* held that the application of Maryland Code (1957, 1969 Cum. Supp.), Art. 26, § 70-1 (c), and Code of Public Local Laws of Baltimore City (1949 ed.), § 240 (b), which placed juveniles between the ages of 16 and 18 under the "adult" jurisdiction of the Criminal Court of Baltimore while juveniles of the same age in the counties were under the "juvenile" jurisdiction of the circuit courts, was a denial of the equal protection of the laws. The petitioner should be granted a declaration that his prior burglary convictions are null and void and an order directed to the clerk of the Criminal Court of Baltimore to expunge the records of his convictions.[1]

The majority suggests that petitioner, in seeking to have *Long v. Robinson* applied to cases prior to May 15, 1969, is asking us to overrule our prior decision in *Franklin v. State,* 264 Md. 62, 285 A. 2d 616 (1972). However, no question of overruling the *Franklin* decision is presented in this case. While dicta in *Franklin* suggested that May 15, 1969, should be the determinative date for applying *Long,* the case did not involve one who had committed an offense and whose

---

1. In his bill of complaint, petitioner sought a declaration that his conviction for the four burglaries committed after his sixteenth birthday and before his eighteenth birthday be declared null and void because the Juvenile Court did not waive its jurisdiction over those offenses before his trial in the Criminal Court of Baltimore. He also sought a declaration that his conviction for the two burglaries committed before his sixteenth birthday be declared null and void because, although the Juvenile Court waived jurisdiction over those offenses, no hearing was granted to him before the waiver order. In Kemplen v. Maryland, 428 F. 2d 169 (4th Cir. 1970), the United States Court of Appeals for the Fourth Circuit, in a case from Maryland, held that a juvenile was entitled to a hearing and to representation by counsel at the hearing before the Juvenile Court could waive its jurisdiction. The court also held that its decision was to be applied retroactively. The petitioner, throughout these proceedings, has consistently argued that retroactive effect should be given to *Kemplen* as well as *Long.* Neither the trial court, nor the Court of Special Appeals, nor the majority opinion of this Court, has drawn a distinction between the two questions. Consequently, I shall not discuss the retroactivity of *Kemplen* as a separate issue. However, for essentially the same reasons set forth by the Fourth Circuit in *Kemplen,* 428 F. 2d at 175-178, I believe that Maryland courts should give full retroactive effect to the holding in *Kemplen.*

conviction had become final prior to May 15, 1969. The offense for which Franklin was convicted occurred on July 15, 1969, and this Court held that under *Long*, the Criminal Court of Baltimore had no jurisdiction to try him.

As the majority points out, beginning with *Linkletter v. Walker*, 381 U. S. 618, 85 S. Ct. 1731, 14 L.Ed.2d 601 (1965), and continuing in numerous subsequent cases, the Supreme Court has held that certain constitutional rulings should not be retroactively applied in criminal litigation. With respect to most situations where the question arises, the Court has held that whether a constitutional ruling should be applied retroactively to criminal cases is governed by a "three pronged test," summarized in *Stovall v. Denno*, 388 U. S. 293, 296-297, 87 S. Ct. 1967, 1969-1970, 18 L.Ed.2d 1199 (1967), and all subsequent cases as follows:

> "Our recent discussions of the retroactivity of other constitutional rules of criminal procedure make unnecessary any detailed treatment of that question here. Linkletter v. Walker, supra; Tehan v. United States ex rel. Shott, supra [382 U. S. 406, 86 S. Ct. 459, 15 L.Ed.2d 453 (1966)]; Johnson v. State of New Jersey, supra [384 U. S. 719, 86 S. Ct. 1772, 16 L.Ed.2d 882 (1966)]. These cases establish the principle that in the criminal litigation concerning constitutional claims, "the Court may in the interest of justice make the rule prospective . . . where the exigencies of the situation require such an application" . . . .' *Johnson,* supra, 384 U. S., at 726-727, 86 S. Ct., at 1777. *The criteria guiding resolution of the question implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards."* (Emphasis supplied.)

On the other hand, as I understand the Supreme Court's opinions, there are circumstances where constitutional

holdings are to be applied retroactively to criminal cases without regard for the analysis or criteria of *Linkletter v. Walker* and *Stovall v. Denno.* One circumstance in which a constitutional ruling should be given full retrospective effect is where the ruling declared no new principle of constitutional law, overruled no prior authority, but merely applied settled constitutional principles to a particular type of situation. *Desist v. United States,* 394 U. S. 244, 247-248, 89 S. Ct. 1030, 22 L.Ed.2d 248 (1969); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U. S. 481, 496, 88 S. Ct. 2224, 20 L.Ed.2d 1231 (1968). Another circumstance where the *Linkletter* and *Stovall* principle of nonretroactivity has no application is where the constitutional holding in question would have prevented the criminal trial from taking place — where the conduct would not have been subject to the criminal prosecution and punishment. *Robinson v. Neil,* 409 U. S. 505, 93 S. Ct. 876, 35 L.Ed.2d 29 (1973).

These principles compel the conclusion that *Long v. Robinson* should be applied retroactively in the present case. *First,* that case did not overrule any prior authority and did not announce any new principles of constitutional law, but merely applied settled equal protection principles to strike down a discriminatory practice in Baltimore City. *Second,* under the holding in *Long v. Robinson,* petitioner's criminal trial and punishment should not have taken place. Instead, under the Equal Protection Clause of the Fourteenth Amendment, petitioner should have been proceeded against and, if found to have been delinquent, dealt with as a juvenile without suffering a criminal conviction and the subsequent disabilities which such conviction imposes. *Third,* even if the "three prong test" of *Linkletter v. Walker, Stovall v. Denno,* and subsequent cases is pertinent here, I believe that the application of the *Linkletter* and *Stovall* criteria requires that full retroactivity be accorded the holding in *Long v. Robinson.*

I.

Under the Supreme Court's cases, whether a particular judicial decision on a constitutional issue should be applied

prospectively or retroactively, depends in the first instance on whether or not the decision declared a *new* principle of constitutional law. If it did announce a new principle, then other considerations for determining whether it should be applied retroactively, such as the three prong test set forth in *Stovall v. Denno* and other cases, may become relevant. But if the judicial ruling in question did not represent a departure from settled principles, it should be given full retroactive effect regardless of other considerations.

That the principle of nonretroactivity only comes into play in connection with decisions declaring *new* doctrine has been made clear by the Supreme Court on many occasions. In *Hanover Shoe, Inc. v. United Shoe Mach. Corp., supra,* a civil antitrust action, the Supreme Court held that it did not have to decide whether the principle of nonretroactivity should be applied beyond the area of criminal law to certain antitrust decisions because those decisions did not involve a "novel" issue and did not overrule earlier cases. The Court there stated (392 U. S. at 496, emphasis supplied):

> "The theory of the Court of Appeals seems to have been that when a party has significantly relied upon a clear and established doctrine, and the retrospective application of a newly declared doctrine would upset that justifiable reliance to his substantial injury, considerations of justice and fairness require that the new rule apply prospectively only. Pointing to recent decisions of this Court in the area of the criminal law, the Court of Appeals could see no reason why the considerations which had favored only prospective application in those cases should not be applied as well as in the civil area, especially in a treble-damage action. *There is, of course, no reason to confront this theory unless we have before us a situation in which there was a clearly declared judicial doctrine upon which United relied and under which its conduct was lawful, a doctrine which was overruled in favor of a new rule*

*according to which conduct performed in reliance upon the old rule would have been unlawful.* Because we do not believe that this case presents such a situation, we have no occasion to pass upon the theory of the Court of Appeals.

"Neither the opinion in *Alcoa* [*United States v. Aluminum Co. of America,* 148 F. 2d 416 (2d Cir. 1945)] nor the opinion in *American Tobacco* [*American Tobacco Co. v. United States,* 328 U. S. 781, 66 S. Ct. 1125, 90 L. Ed. 1575 (1946)] indicated that the issue involved *was novel,* that innovative principles were necessary to resolve it, *or that the issue had been settled in prior cases in a manner contrary to the view held by those courts.* In ruling that it was not necessary to exclude competitors to be guilty of monopolization, the Court of Appeals for the Second Circuit relied upon a long line of cases in this Court stretching back to 1912. 148 F. 2d, at 429. The conclusion that actions which will show monopolization are not 'limited to manoeuvres not honestly industrial' was also premised on earlier opinions of this Court, particularly United States v. Swift & Co., 286 U. S. 106, 116, 52 S. Ct. 460, 76 L. Ed. 999 (1932)."

In *Desist v. United States, supra,* the issue was whether the decision in *Katz v. United States,* 389 U. S. 347, 88 S. Ct. 507, 19 L.Ed.2d 576 (1967), should be applied retroactively, and the petitioner's initial argument for retroactivity was that *Katz* had not overruled any prior case. The Court, however, held that it was "compelled to decide whether" *Katz's* "application should be limited to the future" because *Katz* represented a "clear break with the past," and had overruled *Goldman v. United States,* 316 U. S. 129, 62 S. Ct. 993, 86 L. Ed. 1322 (1942), and *Olmstead v. United States,* 277 U. S. 438, 48 S. Ct. 564, 72 L. Ed. 944 (1928). The Court in *Desist* explained (394 U. S. at 247):

"We are met at the outset with the petitioners' contention that *Katz* does not actually present a

choice between prospective or retroactive application of new constitutional doctrine. The Court in that decision, it is said, did not depart from any existing interpretation of the Constitution, but merely confirmed the previous demise of obsolete decisions enunciating the distinction between 'trespassory' searches and those in which there was no physical penetration of the protected premises."

And the Court continued (394 U. S. at 247-248, emphasis supplied):

"But this contention misconstrues our opinion in *Katz*. Our holding there that *Goldman* and *Olmstead* 'can no longer be regarded as controlling,' 389 U. S., at 353, 88 S. Ct., at 512, recognized that those decisions had not been overruled until that day. True, the principles they expressed had been modified. The belief that an oral conversation could not be the object of a 'search' or 'seizure' had not survived. And in Silverman v. United States, 365 U. S. 505, 81 S. Ct. 679, 5 L.Ed.2d 734, we had cautioned that the scope of the Fourth Amendment could not be ascertained by resort to the 'ancient niceties of tort or real property law.' 365 U. S., at 511, 81 S. Ct., at 682. But the assumption persisted that electronic surveillance did not offend the Constitution unless there was an 'actual intrusion into a constitutionally protected area.' While decisions before *Katz* may have reflected growing dissatisfaction with the traditional tests of the constitutional validity of electronic surveillance, the Court consistently reiterated those tests and declined invitations to abandon them. *However clearly our holding in Katz may have been foreshadowed, it was a clear break with the past, and we are thus compelled to decide whether its application should be limited to the future.*"

*See also Chevron Oil Company v. Hudson,* 404 U. S. 97, 106, 92 S. Ct. 349, 355, 30 L.Ed.2d 296 (1971) ("the decision to be applied nonretroactively must establish a new principle of law . . . ."); *Lemon v. Kurtzman,* 411 U. S. 192, 197-198, 206-207, 210-211, 93 S. Ct. 1463, 36 L.Ed.2d 151 (1973) (both the plurality opinion of the Chief Justice and the dissenting opinion of Mr. Justice Douglas).

Consequently, the Supreme Court cases in the criminal law area which have considered whether a decision should just be applied prospectively all involve decisions which overruled or which were inconsistent with earlier decisions on the particular issues involved. For example, *Adams v. Illinois,* 405 U. S. 278, 92 S. Ct. 916, 31 L.Ed.2d 202 (1972); *Arsenault v. Commonwealth of Massachusetts,* 393 U. S. 5, 89 S. Ct. 35, 21 L.Ed.2d 5 (1968); *McConnell v. Rhay,* 393 U. S. 2, 89 S. Ct. 32, 21 L.Ed.2d 2 (1968); and *Pickelsimer v. Wainwright,* 375 U. S. 2, 84 S. Ct. 80-81, 11 L.Ed.2d 41 (1963), all dealt with whether the right to the assistance of counsel at various stages in state criminal proceedings, announced in *Gideon v. Wainwright,* 372 U. S. 335, 83 S. Ct. 792, 9 L.Ed.2d 799 (1963), should be applied prospectively only. *Gideon,* of course, had overruled *Betts v. Brady,* 316 U. S. 455, 62 S. Ct. 1252, 86 L. Ed. 1595 (1942). The case which first announced the rule of nonretroactivity for certain constitutional holdings in criminal cases, *Linkletter v. Walker, supra,* was concerned with whether *Mapp v. Ohio,* 367 U. S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961), which had overruled *Wolf v. Colorado,* 338 U. S. 25, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949), should be applied retroactively. In *Tehan v. United States,* 382 U. S. 406, 86 S. Ct. 459, 15 L.Ed.2d 453 (1966), the issue was whether *Griffin v. California,* 380 U. S. 609, 85 S. Ct. 1229, 14 L.Ed.2d 106 (1965), which, when coupled with *Malloy v. Hogan,* 378 U. S. 1, 84 S. Ct. 1489, 12 L.Ed.2d 653 (1964), overruled *Adamson v. California,* 332 U. S. 46, 67 S. Ct. 1672, 91 L. Ed. 1903, 171 A.L.R. 1223 (1947), and *Twining v. New Jersey,* 211 U. S. 78, 29 S. Ct. 14, 53 L. Ed. 97 (1908), should be applied retroactively. The remaining cases dealing with the retroactivity of constitutional decisions in the criminal law area have similarly concerned decisions

overturning previous decisions and announcing new constitutional principles.[2]

---

**2.** The retroactivity of Escobedo v. Illinois, 378 U. S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), which had overruled numerous prior cases such as Crooker v. California, 357 U. S. 433, 78 S. Ct. 1287, 2 L.Ed.2d 1448 (1958), and Cicenia v. LaGay, 357 U. S. 504, 78 S. Ct. 1297, 2 L.Ed.2d 1523 (1958), was before the Court in Johnson v. New Jersey, 384 U. S. 719, 86 S. Ct. 1772, 16 L.Ed.2d 882 (1966). *See also* Michigan v. Tucker, 417 U. S. 433, 94 S. Ct. 2357, 41 L.Ed.2d 182 (1974).

In Stovall v. Denno, *supra,* the question was the retroactivity of United States v. Wade, 388 U. S. 218, 87 S. Ct. 1926, 18 L.Ed.2d 1149 (1967), and Gilbert v. California, 388 U. S. 263, 87 S. Ct. 1951, 18 L.Ed.2d 1178 (1967), which, in holding that the Constitution required the exclusion of certain tainted identification evidence, had overruled the "virtually unanimous weight of [prior] authority." (388 U. S. at 300.)

Witherspoon v. Illinois, 391 U. S. 510, 523, 88 S. Ct. 1770, 1777, 20 L.Ed.2d 776 (1968), which held that in a capital case prospective jurors could not be excluded because they had conscientious scruples against the infliction of the death penalty, and that the ruling should be applied retroactively, overruled Logan v. United States, 144 U. S. 263, 298, 12 S. Ct. 617, 628, 36 L. Ed. 429 (1892).

Roberts v. Russell, 392 U. S. 293, 88 S. Ct. 1921, 20 L.Ed.2d 1100 (1968), applied retroactively Bruton v. United States, 391 U. S. 123, 88 S. Ct. 1620, 20 L.Ed.2d 476 (1968), which had overruled Delli Paoli v. United States, 352 U. S. 232, 77 S. Ct. 294, 1 L.Ed.2d 278 (1957), and had held that "admission at a joint trial of a defendant's extrajudicial confession implicating a codefendant violated the codefendant's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment." (392 U. S. at 293.)

In De Stefano v. Woods, 392 U. S. 631, 88 S. Ct. 2093, 20 L.Ed.2d 1308 (1968), the Court declined to apply Duncan v. Louisiana, 391 U. S. 145, 88 S. Ct. 1444, 20 L.Ed.2d 491 (1968), and Bloom v. Illinois, 391 U. S. 194, 88 S. Ct. 1477, 20 L.Ed.2d 522 (1968), retroactively. *Duncan* and *Bloom* had in turn overruled Maxwell v. Dow, 176 U. S. 581, 20 S. Ct. 448, 44 L. Ed. 597 (1900), and other "past opinions of this Court to the effect that the Sixth Amendment right to jury trial was not applicable to the States." (392 U. S. at 634.) *See also* Daniel v. Louisiana, 420 U. S. 31, 95 S. Ct. 704, 42 L.Ed.2d 790 (1975).

In Fuller v. Alaska, 393 U. S. 80, 89 S. Ct. 61, 21 L.Ed.2d 212 (1968), concerning the admissibility in State trials of evidence obtained in violation of the Federal Communications Act, the Court declined to apply retroactively Lee v. Florida, 392 U. S. 378, 88 S. Ct. 2096, 20 L.Ed.2d 1166 (1968), which had overruled Schwartz v. State of Texas, 344 U. S. 199, 73 S. Ct. 232, 97 L. Ed. 231 (1952).

Berger v. California, 393 U. S. 314, 89 S. Ct. 540, 21 L.Ed.2d 508 (1969), gave retroactive application to Barber v. Page, 390 U. S. 719, 88 S. Ct. 1318, 20 L.Ed.2d 255 (1968), which in conjunction with Pointer v. State of Texas, 380 U. S. 400, 85 S. Ct. 1065, 13 L.Ed.2d 923 (1965), overruled West v. Louisiana, 194 U. S. 258, 24 S. Ct. 650, 48 L. Ed. 965 (1904), concerning the application in State trials of the Sixth Amendment's Confrontation Clause.

In Ashe v. Swenson, 397 U. S. 436, 437, n. 1, 90 S. Ct. 1189, 25 L.Ed.2d 469 (1970), the Court stated that Benton v. Maryland, 395 U. S. 784, 89 S. Ct. 2056, 23 L.Ed.2d 707 (1969), holding that the Fifth Amendment's Double Jeopardy Clause was applicable to the States, should be applied retroactively. *Benton* had overruled Palko v. Connecticut, 302 U. S. 319, 58

Moreover, the language and reasoning employed by the Supreme Court in the cases applying the so-called "three prong test" to determine whether a constitutional ruling should be applied retroactively, confirm that any consideration of nonretroactive application is limited to a decision announcing *new* constitutional doctrine. For example, in *Linkletter v. Walker, supra,* 381 U. S. at 624, after discussing the Austinian view of judicial decisions and

---

S. Ct. 149, 82 L. Ed. 288 (1937). *See also* Robinson v. Neil, 409 U. S. 505, 93 S. Ct. 876, 35 L.Ed.2d 29 (1973).

Williams v. United States, 401 U. S. 646, 91 S. Ct. 1148, 28 L.Ed.2d 388 (1971), and Hill v. California, 401 U. S. 797, 802, 91 S. Ct. 1106, 28 L.Ed.2d 484 (1971), were concerned with whether Chimel v. California, 395 U. S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969), which narrowed the scope of permissible searches incident to arrest, should be applied retroactively. *Chimel* had overruled United States v. Rabinowitz, 339 U. S. 56, 70 S. Ct. 430, 94 L. Ed. 653 (1950), and Harris v. United States, 331 U. S. 145, 67 S. Ct. 1098, 91 L. Ed. 1399 (1947).

Both United States v. United States Coin and Currency, 401 U. S. 715, 91 S. Ct. 1041, 28 L.Ed.2d 434 (1971), and Mackey v. United States, 401 U. S. 667, 91 S. Ct. 1160, 28 L.Ed.2d 404 (1971), were concerned with the retroactivity of two different applications of the holding in Marchetti v. United States, 390 U. S. 39, 88 S. Ct. 697, 19 L.Ed.2d 889 (1968), and Grosso v. United States, 390 U. S. 62, 88 S. Ct. 709, 19 L.Ed.2d 906 (1968). *Marchetti* and *Grosso* had overruled United States v. Kahriger, 345 U. S. 22, 73 S. Ct. 510, 97 L. Ed. 754 (1953), and Lewis v. United States, 348 U. S. 419, 75 S. Ct. 415, 99 L. Ed. 475 (1955), with respect to the applicability of the Fifth Amendment's privilege against self-incrimination to the registration and wagering tax requirements of the Internal Revenue Code, 26 U.S.C. 4401, 4411, 4412, 4901.

In Stewart v. Massachusetts, 408 U. S. 845, 92 S. Ct. 2845, 33 L.Ed.2d 744 (1972), and several other cases decided at the same time, the Court applied Furman v. Georgia, 408 U. S. 238, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972), retroactively. *Furman*, of course, was inconsistent with a multitude of cases concerning the constitutionality under the Eighth Amendment of the death penalty.

Michigan v. Payne, 412 U. S. 47, 93 S. Ct. 1966, 36 L.Ed.2d 736 (1973), dealt with the retroactivity of the due process holding of North Carolina v. Pearce, 395 U. S. 711, 89 S. Ct. 2072, 23 L.Ed.2d 656 (1969), which had overruled numerous prior cases concerning the extent of a trial judge's discretion in re-sentencing. *See* 412 U. S. at 55-56.

The Court in Gosa v. Mayden, 413 U. S. 665, 93 S. Ct. 2926, 37 L.Ed.2d 873 (1973), considered whether to apply O'Callahan v. Parker, 395 U. S. 258, 89 S. Ct. 1683, 23 L.Ed.2d 291 (1969), retroactively. *O'Callahan* had held that because of the guarantees of the Fifth and Sixth Amendments concerning grand jury indictment and trial by jury, "a military tribunal ordinarily may not try a serviceman charged with a crime that has no service connection." 413 U. S. at 673. This holding was, in the language of Mr. Justice Blackmun's plurality opinion, a " 'clear break with the past' " and a "new approach" because the "Court long and consistently had recognized that military status in itself was sufficient for the exercise of court-martial jurisdiction." 413 U. S. at 672-673.

its adoption in the more recent Supreme Court cases (as opposed to the so-called Blackstonian view reflected in *Norton v. Shelby County*, 118 U. S. 425, 6 S. Ct. 1121, 30 L. Ed. 178 (1886)), the Court stated:

"Implicit in such an approach [the Austinian view] is the admission *when a case is overruled* that the earlier decision was wrongly decided. However, rather than being erased by *the later overruling decision* it is considered as an existing juridical fact *until overruled,* and intermediate cases finally decided under it are not to be disturbed." (Emphasis supplied.)

The reasoning of the Court underlying the nonretroactivity principle, throughout its opinion in *Linkletter,* was that "decisions though later overruled, 'are law none the less for intermediate transactions'" (381 U. S. at 625); that the "'past cannot always be erased by a new judicial declaration'" (*ibid.*); and that "the existence of the Wolf doctrine prior to Mapp is 'an operative fact and may have consequences which cannot justly be ignored'" (*id.* at 636).

The very manner in which the three prong test for determining nonretroactivity was set forth in *Stovall v. Denno, supra,* 388 U. S. at 297, which is the formulation set forth in all of the subsequent cases dealing with the issue, shows that the rule of nonretroactivity has application only where a *new* constitutional doctrine is announced. To repeat, the Court stated in *Stovall*:

"The criteria guiding resolution of the question implicate (a) the purpose to be served by the *new standards,* (b) the extent of the reliance by law enforcement authorities on the *old standards,* and (c) the effect on the administration of justice of a retroactive application of the *new standards.*" (Emphasis supplied.)

*See also Williams v. United States, supra,* 401 U.S. at 651:

"In Linkletter v. Walker . . . we declined to give complete retroactive effect to the exlusionary rule

of Mapp v. Ohio . . . . Relying on prior cases, we firmly rejected the idea that all *new interpretations* of the Constitution must be considered always to have been the law and that *prior constructions to the contrary* must always be ignored." (Emphasis supplied.)

The Supreme Court's decision just this past term in *United States v. Peltier,* 422 U. S. 531, 95 S. Ct. 2313, 45 L.Ed.2d 374 (1975), confirms that the rule of non-retroactivity for constitutional adjudications depends initially on whether the decision in question has announced a *new* constitutional principle. The issue in *Peltier* was whether *Almeida-Sanchez v. United States,* 413 U. S. 266, 93 S. Ct. 2535, 37 L.Ed.2d 596 (1973), was to be applied retroactively. *Almeida-Sanchez* had held that a search of an automobile without a warrant and without probable cause, conducted twenty-five miles from the Mexican border by border patrol agents, violated the Fourth Amendment so as to require the exclusion of the evidence resulting from the search. The majority opinion of the United States Court of Appeals for the Ninth Circuit, sitting en banc, had held in *Peltier* that the defendant was entitled to the benefit of the holding in *Almeida-Sanchez,* not because of any considerations of retroactivity or nonretroactivity, but because "*Almeida-Sanchez* overruled no prior decision of this [the Supreme] Court and instead 'reaffirmed well-established Fourth Amendment standards.' " (422 U. S. at 533.) The dissenting opinion in the Ninth Circuit, while "expressing some doubt about the applicability of the old law-new law test as a precondition to retroactive analysis," nevertheless "concluded that Almeida-Sanchez had announced a new constitutional rule," overruling a uniform course of decisions by several United States Courts of Appeal upholding the statutory authority and administrative regulations upon which the border patrol agents relied. (422 U. S. at 534.) Consequently, the dissenters in the Ninth Circuit believed that retroactivity was to be determined by the three prong test summarized in *Stovall v. Denno, supra,* 388 U. S. at 297.

The Supreme Court in *Peltier* reversed, not on the ground that "the old law-new law test" was not applicable as a precondition to retroactive analysis, but on the ground that prior to "*Almeida-Sanchez*, roving border patrol searches under sec. 287 (a)(3) [of the Immigration and Nationality Act of 1952, 8 U.S.C. 1357 (a)(3)] were upheld repeatedly against constitutional attack" by the United States Courts of Appeal for the Fifth, Ninth and Tenth Circuits. *Id.* at 540. The Court's opinion by Mr. Justice Rehnquist, disagreeing with the dissenting opinion of Mr. Justice Brennan that the "decision in *Almeida-Sanchez* . . . presents no question of prospectivity" because it did not constitute " ' a sharp break in the line of earlier authority' " (*id.* at 544), pointed out that the border patrol agents had acted "in reliance upon a validly enacted statute, supported by longstanding administrative regulations and continuous judicial approval" and that parties may "reasonably rely upon . . . legal pronouncements emanating from sources other than this Court . . . ." (*Id.* at 541-542.) The majority opinion of the Court thus treated the exclusionary rule decision in *Almeida-Sanchez* as representing a "new constitutional principle . . . [to] be accorded only prospective application" under the test applied in *Linkletter v. Walker, supra,* and other similar cases. (*Id.* at 535.)

While *Peltier* makes it clear that a "new constitutional principle" for purposes of the rule of nonretroactivity need not always stem from the overruling of a prior United States Supreme Court decision, and while the majority and dissenting opinions in *Peltier* disagreed over the nature of the lower federal court decisions involved and the extent to which border patrol agents could have justifiably relied on them (*id.* at 540-542), nevertheless the majority opinion did appear to reaffirm that the question of nonretroactivity only arises with respect to decisions declaring *new* constitutional doctrine.

It is entirely reasonable to limit consideration of the *Linkletter* and *Stovall* rule of nonretroactivity to those decisions declaring a new constitutional principle or doctrine. For example, at the time of the defendant's trial in *Linkletter,*

the admission at the trial of evidence seized in violation of the Fourth Amendment was proper under *Wolf v. Colorado, supra.* It was only the later change in authoritative decisions, coming with *Mapp v. Ohio, supra,* that in retrospect cast doubt upon the propriety of the admission of the evidence. But where there is no change in the applicable constitutional doctrine, and the defendant's criminal conviction violated constitutional requirements then recognized to be in effect, the defendant's conviction was improper at the time it occurred. Absent a knowing waiver of his then existing constitutional right at the time of his trial, traditional principles would permit him to challenge his conviction later in a collateral proceeding on the constitutional ground. *Cf. Fay v. Noia,* 372 U. S. 391, 83 S. Ct. 822, 9 L.Ed.2d 837 (1963); *Jourdan v. State,* 275 Md. 495, 341 A. 2d 388 (1975).[3]

Moreover, where a decision announces no new constitutional principle, there is no basis for the argument that public officials "relied" upon the "old" constitutional principle. Finally, where a decision involves merely the application of settled constitutional principles to a particular practice, there is much less justification for public officials to complain about the effect of the decision upon the administration of justice.

*Long v. Robinson, supra,* declared no new constitutional doctrine, overruled no prior authority, but merely applied long established principles under the Equal Protection Clause of the Fourteenth Amendment to strike down an arbitrary and discriminatory practice in Maryland.[4] Pursuant to local law, youths between the ages of sixteen

---

**3.** The Supreme Court has consistently rejected the argument that, with respect to the retroactivity of a constitutional holding, a distinction should be made between cases on direct review from a criminal conviction and those involving a later collateral attack upon the criminal conviction. *See, e.g.,* Williams v. United States, *supra,* 401 U. S. at 651-652; Desist v. United States, *supra,* 394 U. S. at 253.

**4.** While a 1967 opinion of the Court of Special Appeals, Graves v. State, No. 201, Initial Term, 1967, decided July 21, 1967, had upheld the practice, *Graves* was an unreported *per curiam* opinion, and as such constituted no precedential authority upholding the discrimination. *See* Maryland Rule 1092 b.

and eighteen who were charged with committing an offense in Baltimore City were initially brought before the criminal court and tried and punished as adult criminals, whereas under the public general law of the State, youths between the ages of sixteen and eighteen who were charged with committing the same offense elsewhere in Maryland were initially brought before the juvenile court and, absent a waiver of jurisdiction by the juvenile court, were tried and dealt with as juveniles, without suffering a criminal conviction and its attendant disabilities. Judge Watkins's opinion in *Long v. Robinson* indicates that the State suggested no rational basis or reasonable justification for the distinction. In fact, the evidence of the State officials, reviewed in the *Long v. Robinson* opinion, was to the effect that there was no basis for distinguishing between sixteen and seventeen year olds who committed offenses in Baltimore City and those who committed offenses in other parts of the State. 316 F. Supp. at 27-30. Moreover, nothing in the history of the discriminatory practice, or the history of juvenile proceedings in Maryland set out in the majority opinion in this case, suggests any reasonable ground for the discrimination.

The only basis for the discrimination suggested by the majority in the instant case is that "the youth of Baltimore City were regarded by the General Assembly as reaching that state of maturity where they should be prosecuted as adults two years earlier than their peers in the remainder of the State." This, however, could not have been the basis or rationale for the different treatment, because the distinction was not dependent upon whether the defendant was a "youth of Baltimore City" or a resident elsewhere in the State. Whether a sixteen or seventeen year old was criminally prosecuted or treated as a juvenile for committing a "criminal" or "delinquent" act depended upon where the offense was committed, not upon where in the State the youth resided. Code (1974), § 3-818 (b) of the Courts and Judicial Proceedings Article; Code (1957, 1966 Repl. Vol., 1969 Cum. Supp.), Art. 26, § 70-4 (1); Code (1957, 1963 Repl. Vol.), Maryland Rule 901. In *Long v. Robinson*

itself, one of the plaintiffs in the federal court, who was facing trial as a criminal defendant in the then Municipal Court of Baltimore City, was a sixteen year old resident of Howard County who happened to be temporarily in Baltimore City for a medical appointment when he allegedly committed an offense in Baltimore City. 316 F. Supp. at 24.

While the cases applying the equal protection clause have indicated that there is a wide toleration for territorial distinctions within a state, nevertheless the state's authority is limited to drawing *"reasonable* distinctions between political subdivisions within its borders." *San Antonio Independent School District v. Rodriguez,* 411 U. S. 1, 28, n. 66, 93 S. Ct. 1278, 1294, n. 66, 36 L.Ed.2d 16 (1973) (emphasis supplied). *See McGowan v. Maryland,* 366 U. S. 420, 426, 81 S. Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) ("A statutory discrimination will not be set aside if any state of facts *reasonably* may be conceived to justify it.") (emphasis supplied); *Matter of Trader,* 272 Md. 364, 389, 325 A. 2d 398 (1974) (". . . the Maryland cases seem to require a *rational basis* for territorial discrimination as between different parts of the State.") (emphasis supplied); Horowitz and Neitring, *Intrastate Equal Protection* 15 U.C.L.A. L. Rev. 787 (1968). Almost forty years ago this Court stated with respect to the requirements of the equal protection clause, *Dasch v. Jackson,* 170 Md. 251, 269-270, 183 A. 534 (1935):

> "Nor, apart from any other consideration, is there *any rational basis for the territorial classification made by the act,* for there is no such difference in the conditions existing within the state outside of Baltimore City and those within its limits, in reference to the business of paper hanging, which would make the pursuit of it in the city a menace to the public health and safety but harmless beyond its limits. It is, of course, well settled that the legislature may restrict the application of statutes to localities less in extent than the state . . . as the exigencies of the several parts of the state may require. But broad as that power is, it may not be used to deprive the citizens

of one part of the state of rights and privileges which they enjoy in common with the citizens of all other parts of the state, *unless there is some difference in conditions in the territory selected* and that not affected by the statute, sufficient to afford *some basis,* however slight, for the classification." (Emphasis supplied.)

Since there was no reasonable ground or basis for the distinction between youths committing offenses in Baltimore City and youths committing offenses elsewhere in the State, the striking down of this discriminatory practice in *Long v. Robinson* clearly represented an application of well-settled equal protection principles to the facts of a particular case.[5] *Long v. Robinson* announced no new constitutional doctrine and, consequently, should be given full retroactive effect without regard to the criteria set forth in *Stovall v. Denno* and *Linkletter v. Walker.*[6]

## II.

Another circumstance in which a constitutional ruling should be applied retroactively to a criminal matter, independently of the *Linkletter, Stovall,* etc. analysis, is where the ruling would have prevented the criminal trial from taking place, or the type of punishment from being imposed.

While the principle that certain constitutional decisions should only be applied prospectively has on occasion been invoked in other areas,[7] for the most part this principle of nonretroactivity is limited to matters of *procedure* in the

---

5. As pointed out by Judge Watkins in Long v. Robinson, *supra* 316 F.Supp. at 28-29, as long ago as 1928 the Supreme Court of Missouri invalidated on equal protection grounds a similar practice under the Missouri statutes. State v. Gregori, 318 Mo. 998, 2 S.W.2d 747 (1928).

6. Even if *Long v. Robinson* had involved a "new" application of the requirement that no state shall deny to any persons the equal protection of the laws, I would still doubt that it should be regarded as announcing a new constitutional principle so as to bring into consideration the *Linkletter* rule of nonretroactivity. *Cf.* United States v. United States Coin and Currency, *supra,* 401 U. S. at 728 (concurring opinion of Mr. Justice Brennan).

7. *E.g.,* the plurality opinion of the Chief Justice in Lemon v. Kurtzman, *supra,* 411 U. S. at 193-210.

course of criminal proceedings, from investigation and arrest through trial and disposition. For example, probably a majority of the cases holding that constitutional rulings should not be applied retroactively have involved the exclusionary rules designed to enforce compliance with the Fourth Amendment and the Self-Incrimination Clause of the Fifth Amendment. Several other cases where the Court was concerned with whether or not constitutional rulings should be given retroactive effect have involved aspects of the right to counsel at different stages of the criminal process. The remaining cases applying the *Linkletter* and *Stovall* analysis to criminal matters have involved other procedural rights under the Bill of Rights or the Due Process Clause of the Fourteenth Amendment.[8]

On the other hand, the Supreme Court has made it clear that certain types of cases, not involving questions of procedure arising during the criminal proceedings, are not susceptible to the analysis of *Linkletter, Stovall,* and similar cases. In *Robinson v. Neil, supra,* 409 U. S. at 507-508, the Court in an opinion by Mr. Justice Rehnquist stated (emphasis supplied):

"We do not believe that this case readily lends itself to the analysis established in *Linkletter.* Certainly, there is nothing in *Linkletter* or those cases following it to indicate that all rules and constitutional interpretations arising under the first eight Amendments must be subjected to the analysis there enunciated. *Linkletter* itself announced an exception to *the general rule of retroactivity* in a decision announcing that the exclusionary rule of Mapp v. Ohio, 367 U. S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961), would be given prospective effect only. *Linkletter,* and the other cases relied upon by the Sixth Circuit, dealt with those constitutional interpretations bearing on the use of evidence or on a particular mode of trial. Those procedural rights and methods of conducting

---

8. *See, e.g.,* cases discussed in fn. 2, *supra.*

trials, however, do not encompass all of the rights found in the first eight Amendments. *Guarantees that do not relate to these procedural rules cannot, for retroactivity purposes, be lumped conveniently together in terms of analysis.* For the purpose and effect of the various constitutional guarantees vary sufficiently among themselves so as to affect the necessity for prospective rather than retrospective application.

"*Linkletter* indicated, for instance, that only those procedural rules affecting 'the very integrity of the factfinding process' would be given retrospective effect. 381 U. S., at 639, 85 S. Ct., at 1743. *In terms of some nonprocedural guarantees, thi·· test is simply not appropriate.* In Furman v. Georgia, 408 U. S. 238, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972), for example, this Court held that in the situation there presented imposition of the death penalty was not constitutionally permissible. Yet, while this holding does not affect the integrity of the factfinding process, we have not hesitated to apply it retrospectively *without regard to whether the rule meets the Linkletter criteria. E.g.*, Walker v. Georgia, 408 U. S. 936, 92 S. Ct. 2845, 33 L.Ed.2d 753."

The Court in *Robinson v. Neil* went on to hold that *Waller v. Florida*, 397 U. S. 387, 90 S. Ct. 1184, 25 L.Ed.2d 435 (1970), which had held that the Fifth Amendment's Double Jeopardy Clause prohibited separate state and municipal prosecutions for the same offense, was to be given full retroactive application because the *Waller* ruling would have prevented the state criminal trial and conviction from taking place at all. The Court, although pointing out that the distinction which it was drawing was not "ironclad," explained (409 U. S. at 509, emphasis supplied):

"The guarantee *against double jeopardy is significantly different from procedural guarantees held in the Linkletter line of cases to have*

*prospective effect only.* While this guarantee, like the others, is a constitutional right of the criminal defendant, its practical result is *to prevent a trial from taking place at all, rather than to prescribe procedural rules that govern the conduct of a trial.* A number of the constitutional rules applied prospectively only under the *Linkletter* cases were found not to affect the basic fairness of the earlier trial, but to have been directed instead to collateral purposes such as the deterrence of unlawful police conduct, Mapp v. Ohio, *supra.* In *Waller*, however, the Court's ruling was squarely directed to the prevention of the second trial's taking place at all, even though it might have been conducted with a scrupulous regard for all of the constitutional procedural rights of the defendant."

*See also Ashe v. Swenson, supra,* 397 U. S. at 437, n. 1, that "[t]here can be no doubt of the 'retroactivity' of the Court's decision in Benton v. Maryland," 395 U. S. 784, 88 S. Ct. 2056, 23 L.Ed.2d 707 (1969), holding the Fifth Amendment's Double Jeopardy Clause applicable to state criminal proceedings.

Again in *United States v. United States Coin and Currency, supra,* 401 U. S. at 722-724, the Court held that a constitutional ruling which would have stopped the trial and punishment from taking place, should be applied retroactively. *Marchetti v. United States, supra,* 390 U. S. 39, and *Grosso v. United States, supra,* 390 U. S 62, had, in overruling earlier cases, held that the criminal conviction of gamblers who asserted their privilege against self-incrimination as a ground for not complying with certain aspects of the federal gambling tax law, was constitutionally precluded. *United States v. United States Coin and Currency, supra,* held that *Marchetti* and *Grosso* also precluded the forfeiture of the gambling proceeds, and should be applied retroactively on the ground that the conduct was constitutionally immune from punishment. In an opinion by Mr. Justice Harlan, the Court said (401 U. S. at 723, emphasis supplied):

"Unlike some of our earlier retroactivity decisions, we are not here concerned with the implementation of a procedural rule which does not undermine the basic accuracy of the factfinding process at trial. Linkletter v. Walker . . . ; Tehan v. United States ex rel. Shott . . . ; Johnson v. New Jersey . . . ; Stovall v. Denno . . . . Rather, *Marchetti* and *Grosso* dealt with the kind of conduct that *cannot constitutionally be punished in the first instance.* These cases held that gamblers in Angelini's position had the Fifth Amendment right to remain silent in the face of the statute's command that they submit reports which could incriminate them. In the absence of a waiver of that right, such persons could not properly be prosecuted at all."

And, in language particularly apt to the majority's discussion in the instant case concerning the superior fact finding procedures in the criminal court, the Supreme Court in *United States Coin and Currency* went on (401 U. S. at 724):

"In the case before us, however, even the use of impeccable factfinding procedures could not legitimate a verdict decreeing forfeiture, for we have held that the conduct being penalized is constitutionally immune from punishment. No circumstances call more for the invocation of a rule of complete retroactivity."

Furthermore, even where the constitutional ruling would not have prevented the criminal trial, but would have prevented the imposition of the particular penalty involved, the rule of "complete retroactivity" is applicable. Thus, *Walker v. Georgia,* 408 U. S. 936, 92 S. Ct. 2845, 33 L.Ed.2d 753 (1972); *Stewart v. Massachusetts, supra;* and other cases decided at the same time, all gave retroactive effect to the ruling in *Furman v. Georgia, supra,* that the imposition of the death penalty violated the Eighth Amendment. For a discussion of these cases, *see Robinson v. Neil, supra. See also* the plurality opinion of Mr. Justice Blackmun in *Gosa v.*

*Mayden, supra,* 413 U. S. at 679: "But neither are we concerned, as we were in *Robinson,* with a constitutional right that operates to prevent another trial from taking place at all."

Applying these Supreme Court cases to the decision in *Long v. Robinson* dictates that *Long* be given full retroactive effect. Although the majority opinion in the present case compares the procedural rights applicable in a criminal trial with those applicable in juvenile proceedings, this is simply irrelevant. *Long v. Robinson* was not concerned with procedural rights during a trial, but with the unconstitutionality of subjecting certain youths to criminal proceedings and criminal punishment at the same time that other youths of the same age, committing the same acts, were not subject to prosecution and punishment as criminals.[9] If the ruling in *Long v. Robinson* were applied to petitioner, he would not have initially been subject to a criminal trial and to punishment in a Department of Correction institution. Instead, he would have been treated as a juvenile in proceedings which, as this Court has stated repeatedly, are not criminal and the "dispositions are not punishment for crime." *In re Johnson,* 254 Md. 517, 523, 255 A. 2d 419 (1969). And *see In Matter of Cromwell,* 232 Md. 409, 415, 194 A. 2d 88 (1963).

### III.

As previously discussed, the three criteria set forth in the cases applying new constitutional rulings prospectively only, are "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." *Gosa v. Mayden, supra,* 413 U. S. at 679; *Michigan v. Payne,*

---

**9.** This, of course, distinguishes the instant case and *Long* from Gosa v. Mayden, *supra,* upon which the majority relies. *Gosa* was concerned with the retroactivity of O'Callahan v. Parker, *supra,* regarding court martial trials of non-service connected crimes. As the plurality opinion in *Gosa* makes clear, the question was not whether or not one was initially subject to criminal prosecution for non-service connected crimes but whether he was entitled to the *procedural rights* set forth in the Fifth and Sixth Amendments. *See* 413 U. S. at 677-679.

*supra,* 412 U. S. at 51; *Desist v. United States, supra,* 394 U. S. at 249; *Stovall v. Denno, supra,* 388 U. S. at 297. And *see Linkletter v. Walker, supra,* 381 U. S. at 636-639. Even if the retroactivity of *Long v. Robinson* were to be governed by these criteria, retroactive effect should be accorded the *Long* ruling so as to provide relief in the present case.

The most important of the criteria for determining the retroactivity of a constitutional ruling is the *purpose* of the ruling. If the "purpose" test clearly points to retroactivity, the ruling is given "complete retroactive effect," and "[n]either good-faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to require prospective application in these circumstances." *Williams v. United States, supra,* 401 U. S. at 653, and cases therein cited. *See also Michigan v. Payne, supra,* 412 U. S. at 55; *Ivan V. v. City of New York,* 407 U. S. 203, 204, 92 S. Ct. 1951, 32 L.Ed.2d 659 (1972).

Where a major purpose of a constitutional ruling does not relate to the fairness or propriety of the verdict or sentence, but has other objects such as insuring police compliance with the restrictions imposed upon them by the Fourth Amendment (*e.g., United States v. Peltier, supra; Linkletter v. Walker, supra*), the Supreme Court has usually limited the effect of the ruling to subsequent cases. On the other hand, where the purpose of the ruling bears most heavily upon the fairness of the adjudicatory process against a defendant, such as the right to counsel during trial (*Pickelsimer v. Wainwright, supra*) or the right of confrontation (*Berger v. California, supra*), the ruling will normally be given retroactive effect.

Typically, where a constitutional holding is aimed at the adjudicatory process itself, rather than having some extraneous object, it is said to "infect the integrity of the truth-determining process at trial" (*Stovall v. Denno, supra,* 388 U. S. at 298) or the " 'fair determination' of [the defendant's] guilt or innocence" (*Roberts v. Russell, supra,* 392 U. S. at 294). Consequently, the Court has often used such phrases in deciding whether the "purpose" of the

ruling points to retroactivity. The majority in the instant case, because, *inter alia*, it concludes that *Long v. Robinson* did not relate to "determining guilt or innocence" or to the "fact-finding process" at trial, and that the fact-finding process in the Criminal Court of Baltimore was better than that in a juvenile proceeding, holds that *Long* should be applied prospectively only.

However, the "purpose" criteria is broader than this. When the Supreme Court has referred to the "integrity of the fact-finding process," it has meant something more than whether or not the defendant engaged in a particular action. Where a ruling cast doubt about the "verdict of guilt," *Mackey v. United States, supra,* 401 U. S. at 675, it would seem that it should be applied retroactively. Moreover, if the ruling does not affect the criminal verdict but relates only to the sentencing procedure, and may have affected only the punishment imposed, the Supreme Court has clearly held that the purpose of the ruling requires retroactive application. *McConnell v. Rhay, supra,* 393 U. S. at 3 ("The right to counsel at sentencing . . . relates to 'the very integrity of the fact-finding process.' "); *Witherspoon v. Illinois, supra,* 391 U. S. at 523, n. 22 (a ruling striking down a jury selection procedure which related only to the sentence to be imposed or recommended by the jury, was applied retroactively on the ground that it undermined the integrity of the " 'process' that decided the petitioner's fate").

The ruling in *Long v. Robinson,* while it may not have related to the fairness of the procedure for deciding whether a sixteen year old did a particular act, was directly concerned with the fairness of the guilty verdict and the sentence. Under the *Long* holding, petitioner would not have been subject to trial initially as an adult and, absent a waiver of jurisdiction by the juvenile court, would not have suffered a criminal conviction and punishment in an adult prison. Obviously, the *Long* ruling was directly related to the verdict and sentence to be imposed, and thus the "purpose" of the ruling requires that it be applied retroactively.

In another respect, the "purpose" standard dictates

applying *Long v. Robinson* retroactively to grant petitioner relief. The majority opinion in the instant case seems to suggest that the only purpose in trying a youth as a juvenile in Maryland was to rehabilitate him, and that such purpose would only relate to the future. However, the Maryland Legislature has long provided that one of the "purposes" of juvenile proceedings is "[t]o remove from children committing delinquent acts the taint of criminality and the consequences of criminal behavior." Code (1974), § 3-802 (a)(2) of the Courts and Judicial Proceedings Article. This stated "purpose" in the statutes relating to juvenile proceedings clearly calls for applying *Long* retroactively to actions like the present one. The very relief which petitioner seeks is to remove the taint and the disabilities which he suffers, such as loss of the right to vote, because he was improperly convicted of engaging in criminal behavior instead of having been dealt with as a juvenile.

Since the "purpose" standard dictates that *Long v. Robinson* should be given retrospective application, the criteria of "reliance" and "effect on the administration of justice," as previously mentioned, are not particularly relevant. However, both of these criteria also point to retroactivity.

The Supreme Court, in discussing the factor of "reliance" upon old constitutional standards, almost invariably has been referring to the reliance upon prior judicial authority setting forth or upholding the "old" standards. As discussed in Part I, *supra,* there was no prior authority upholding the discriminatory practice in Baltimore City. The only prior reported decision on the subject had, on equal protection grounds, invalidated the type of discrimination involved. Moreover, for the reasons also delineated in Part I, *supra,* any reliance by Maryland officials on the statute authorizing the discrimination would not have been reasonable or justified, and the Supreme Court opinions have repeatedly indicated that the reliance must be "justified." *See, e.g., Roberts v. Russell, supra,* 392 U. S. at 295.

Turning to the effect upon the administration of justice by applying *Long v. Robinson* retroactively, it would seem that

the impact would be minimal. Unlike the many cases in the Supreme Court concerned with the retroactivity of constitutional rulings in criminal cases, the impact of *Long v. Robinson* is local, not affecting the administration of justice throughout the nation or even the entire State of Maryland. Instead, it would only affect convictions in the Criminal Court of Baltimore, of youths between sixteen and eighteen, during a certain span of time. It would involve few people who are still incarcerated, conceded by the State at the time of oral argument in this case to be only about sixteen, and now probably fewer. Expunging the records of those improperly convicted of criminal offenses in light of *Long* should present no insuperable administrative burden, as the court records are all in one clerk's office, that of the Criminal Court of Baltimore. And if expungement should turn out to present a serious administrative burden, at least those in petitioner's position are entitled to declaratory judgments voiding their convictions, thereby restoring their right to vote and removing the other disabilities flowing from a criminal conviction.

In sum, for several reasons, I would agree with the decision in *Woodall v. Pettibone*, 465 F. 2d 49 (4th Cir. 1973), *cert. denied*, 413 U. S. 922 (1973), that *Long v. Robinson* should be given full retroactive effect.

Judge Levine authorizes me to state that he concurs in the views expressed herein.